**Julian J. DONALD, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 40527.

Court of Criminal Appeals of Texas.

July 19, 1967.

Robert B. Billings, Dallas, for appellant.

Hunter B. Brush, Dist. Atty., Milton G. Mell, Asst. Dist. Atty., Tyler, and Leon B. Douglas, State's Atty., Austin, for the State.

OPINION

BELCHER, Judge.

The conviction is under Art. 567b, Vernon's Ann.P.C., for the giving of a worthless check in the amount of $1506.40; the punishment was assessed at four years.

In May, 1964, the appellant was operating twenty-two retail service stations and also selling wholesale to four outlets in Dallas, with a sales volume of 750,000 to 1,000,000 gallons of gasoline per month. The gasoline was supplied to the appellant by three refineries. About May 1, 1964, he became involved financially, having a total indebtedness of around $400,000, and his three suppliers of gasoline placed him on a cash basis. During this time the appellant and La Gloria Oil and Gas Company of Tyler began negotiations for a loan and the refinancing of his business, and for the sale and purchase of gasoline. The $1,506.40 check signed by the appellant, dated July 9, 1964, payable to La Gloria Oil and Gas Company for gasoline is the basis of this prosecution.

Among the grounds urged by the appellant for reversal is that, the trial court erred in refusing his requested charge to the jury which had been timely and properly presented. The requested charge was as follows:

"If you believe from the evidence that the defendant was induced into issuing the check in question by the offer on the part of La Gloria Oil and Gas Company or one of its representatives that he could give a check for oil and gas delivered to him and make the check good from the sale of the gas at a later date, knowing that defendant must pay for it in this manner, or if you have a reasonable doubt thereof, you will say by your verdict not guilty."

The appellant testified in part as follows:

"Q When was this that you and Mr. Cain arrived at some agreement, or

"A was the agreement with someone else?

"A Well, as I said, it was toward the latter part of June, I called Mr. Cain and I asked him if anything had been consummated that we could actually talk about. And he said, 'Well, to this point, there isn't anything actually consummated. It is just going to take a little more time, but, 'he says, 'One thing that will help the situation,' he says 'this is an ungodly amount of gasoline for an operation,' and he says, 'To substantiate the gallonage, to prove to La Gloria Oil & Gas that you do sell this much gasoline, and that they would have a sizeable account and an account that they could depend on,' *he says, 'You ought to start buying gasoline from us.' I said, 'Well, John, there isn't a way in the world that I can start buying gasoline from you unless you want to deliver it to me on credit.'*

"Q. And this was at this conversation you told him that?

"A Yes, sir.

"Q And what was his reaction to that?

"A He said, 'Well, I don't know if that could be worked out at the present time, because of your debt to Anderson. *'But,' he says, 'There must be a way that we can get the situation started, in order to benefit all parties concerned.'*

"Q Did you all make an agreement at that time as to your operation at all?

"A Not at that particular time. No we did not.

"Q When did you all get together again?

"A A few days after that, Mr. Mason came to Dallas.

"Q Do you mean by himself? Or with someone?

"A He was by himself.

"Q Did he come to your office?

"A *He came to my office. And we discussed the entire situation, the loan and the availability of credit and the prospect of me buying gasoline from them, etc., and through the process of conversation, we arrived at a decision where I would start buying gasoline from them.*

"Q What was this agreement with them as to how you would buy gasoline from them?

"A We reached an agreement on this basis. That, number one, Gas Mart had some Judgments on record and I was operating so close with the money situation and had so many taxes that were owed, etc. that—

"Q And you told Mr. Mason about this?

"A Yes, and Mr. Cain and Mr. Jones also—they were aware of that. *And we arrived at a way to handle the gasoline was for me to send a blank check down to the refinery.*

\* \* \* \* \* \*

"Q And what were the further details of this agreement?

"A Well. I was to establish this checking account, and as I sold the gasoline, put the money in the bank to clear the checks.

"Q *And this was their agreement with you?*

"A *Yes.*

\* \* \* \* \* \*

"Q Now, this was your operation which started in July of 1964. Is that right? Somewhere the first part of July?

"A Yes, yes.

"Q Now, right after you started this operation, were you contacted by Mr. Mason or Mr. Cain again?

"A *After I started sending the trucks down to the Tyler refinery with these blank checks with them, I believe 4 or 5 loads of gasoline had been received and 4 or 5 checks had been delivered to the Tyler refinery, and I stand to be corrected on this, but I believe they had deposited the first checks, and we made our initial deposit. Mr. Mason called me—and his words were, 'Julian', he says, 'Our bookkeeping department or office department just called the Merchants State Bank,' and he says, 'You know there is only $1900.00 in that account as of this morning,' and he says, 'There are more checks than that now being processed.' And I said, 'I know it, but I have to sell the gasoline and put the money in the bank.' He says, 'Okay, be sure and take care of everything.'*

"Q *Your original agreement was just like you told us, and that occurred prior to this telephone conversation. Is that right?*

"A *Yes.*

"Q *And you were to sell the gasoline and deposit the money in the bank?*

"A *Right.*

"Q *And make payments on those checks?*

"A *Right.*"

In rebuttal, Cliff Mason, testified for the state as follows:

"Q Mr. Mason, you testified yesterday, I believe, that you were *the original La Gloria representative* to be in touch with Mr. Donald with regard to the possible purchase of Petroleum Products from La Gloria by Mr. Donald and his Gas Mart Systems?

"A That's right.

"Q All right, sir. Did you also testify that you were the representative of La Gloria, who worked out the arrangements under which these purchases were to be made?

"A Yes, I was.

"Q And what was that arrangement?

"A That Mr. Donald would pay for the product purchased by check on his corporation, signed by Julian J. Donald.

"Q Did you consider this to be an extension of credit to Mr. Donald or to Gas Mart Systems?

"A No, sir.

"Q Did Mr. Donald ever express to you that he did not feel that his checks would be good?

"A No, he did not.

"Q Did he ever indicate to you that he would have to wait until he could get the gasoline purchased back to Dallas and there sell it and collect for it and take that money and put it in the bank to cover the check with which he had originally purchased that gasoline from La Gloria?

"A No, sir.

"Q Did you have any sort of discussion with Mr. Donald in regard to his checks? That is, whether or not they would be good or not?

"A Not at the time the original purchases were made.

"Q At what time did you have some conversation with him about that?

"A When Mr. Donald asked if our company would be interested in some

sort of arrangement to finance his operation, or to buy into his operation. At that time I told Mr. Donald that if he wanted our company to consider it at all, that these checks certainly—the first check had better not bounce, or certainly our company would not be interested in pursuing the matter at all. In other words, he had to prove his self to us.

"Q And what did he say in response to this statement by you?

"A That his checks would be honored at the bank.

\* \* \* \* \* \*

"Q Did Mr. Donald at any time prior to the time that he began to make these purchases under the arrangement to which you have previously testified, that is, paying for them with a signed check at the time each load was picked up, at any time prior to the beginning of this business arrangement and these purchases, did he indicate to you in any manner that his checks would not be good, or that he would have to wait until he could sell the products to get the money to cover these checks?

"A No, sir, he did not."

Further, in rebuttal, John Cain, Manager, Wholesale Sales, testified for the state as follows:

"Q Mr. Cain, do you recall receiving a telephone call from Mr. Donald in the latter part of June, 1964, at which time, during which conversation, you advised Mr. Donald that it would be a good idea for him to start buying gasoline or petroleum products from La Gloria?

"A No, sir.

"Q And at that time, do you recall the Defendant telling you that he couldn't buy gasoline from La Gloria, unless La Gloria would let him buy it on credit?

"A No, sir.

"Q Did you ever receive any communication from Mr. Mason to the effect that the Defendant was going to begin buying gasoline from La Gloria, and that Mr. Mason had arranged for him to buy this gasoline and pay for it at the loading dock at the time the truck was loaded, with a check, and that Mr. Donald was then going to clear these checks with the money from the sale of the products that he bought from you?

"A No, sir."

■ The appellant's testimony raised the issue of whether the gasoline transactions were by agreement, credit sales, that is, the checks for the gasoline would be paid from the money deposited from the sale of the gasoline.

The testimony of Mason and Cain recognize the position here taken by the appellant, but each denied making any agreement for such manner of extension of credit; and Mason testified that the appellant told him "That his checks would be honored at the bank."

The appellant was entitled to an appropriate affirmative submission of the defense to the jury as raised by the above testimony, and the main charge did not submit it.

■ The requested charge was sufficient to call the trial court's attention to the omission in the main charge and preserves the error. Art. 36.15 Vernon's Ann. C.C.P.; Barefield v. State, 165 Tex.Cr.R. 581, 309 S.W.2d 451.

The disposition hereof makes unnecessary the review of any ground presented as error other than the one herein considered.

The judgment is reversed and the cause is remanded.